AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of New Jersey

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| ALEXANDER HEIFLER | ) | 26-MJ-15052 |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___March 26, 2026___ in the county of ___Hudson___ in the ___ District of ___New Jersey___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 26, United States Code, Sections 5861(c) and 5871 | Unlawful Possession of Firearms |
| In violation of Title 26, United States Code, Sections 5861(f) and 5871. | Unlawful Making of Firearms |

This criminal complaint is based on these facts:

See Attachment B

❒ Continued on the attached sheet.

/s/ GERALD CASERTINO
_____
*Complainant's signature*

Special Agent Gerald Casertino
_____
*Printed name and title*

Sworn via telephone pursuant to F.R.C.P. 4.1(B)(2)(A)

Date:  ___03/27/2026___

/s/ HON. STACEY D. ADAMS
_____
*Judge's signature*

City and state:  ___Newark, New Jersey___

Hon. Stacey D. Adams
_____
*Printed name and title*

TML

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Stacey D. Adams |
| | : | |
| v. | : | Magistrate. No. 26-MJ-15052 |
| | : | |
| ALEXANDER HEIFLER | : | **CRIMINAL COMPLAINT** |

I, Gerald Casertino, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

/s/ GERALD CASERTINO
Gerald Casertino, Special Agent
Federal Bureau of Investigation

Special Agent Casertino attested to this Affidavit by telephone pursuant to F.R.C.P. 4.1(B)(2)(A) on this 27th day of March, 2026.

/s/ HON. STACEY D. ADAMS
Hon. Stacey D. Adams
United States Magistrate Judge

TML

## ATTACHMENT A

## COUNT ONE

### (Unlawful Possession of Firearms)

On or about March 26, 2026, in Hudson County, in the District of New Jersey, and elsewhere, the defendant,

ALEXANDER HEIFLER,

knowingly possessed firearms, as defined in Title 26, United States Code, Section 5845(a)(8) and Title 26, United States Code, Section 5845(f), that were made, as defined in Title 26, United States Code, Section 5845(i), in violation of Chapter 53 of Title 26, United States Code, specifically, Title 26, United States Code, Section 5822.

In violation of Title 26, United States Code, Sections 5861(c) and 5871.

## COUNT TWO

### (Unlawful Making of Firearms)

On or about March 26, 2026, in Hudson County, in the District of New Jersey, and elsewhere, the defendant,

ALEXANDER HEIFLER,

knowingly made, as defined in Title 26, United States Code, Section 5845(i), firearms, as defined in Title 26, United States Code, Section 5845(a)(8) and Title 26, United States Code, Section 5845(f), in violation of Chapter 53 of Title 26, United States Code, specifically, Title 26, United States Code, Section 5822.

In violation of Title 26, United States Code, Sections 5861(f) and 5871.

## ATTACHMENT B

I, Gerald Casertino, am a Special Agent of the Federal Bureau of Investigation ("FBI"). The information contained in the complaint is based upon my personal knowledge, as well as information obtained from other sources, including: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information; and (c) my review of evidence, including audio and video surveillance and other documents. Because this complaint is being submitted for a limited purpose, I have not set forth every fact that I know concerning this investigation. Where the contents of documents and the actions and statements of others are reported, they are reported in substance and in part, except where otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

1. On or about February 10, 2026, the defendant ALEXANDER HEIFLER ("HEIFLER"), participated in a video call with a group of individuals. Among those individuals was an undercover law enforcement officer (the "UC"). During the call, after stating that he had to be "careful" about what he was about to say, HEIFLER asked the group whether anyone had space to do training for how to use instruments that were not knives, guns, or crossbows for "self-defense." HEIFLER then clarified that he was looking for space where he could throw "Molotovs."[1] After HEIFLER made that comment, the UC sent HEIFLER a message via an encrypted messaging application, stating: "Hey let's talk about that in person / Don't say that on here." HEIFLER responded: "don't use the M-word.  copy that."

2. The following day, on or about February 11, 2026, HEIFLER and the UC met in person. During the meeting, HEIFLER discussed vandalizing the home of a certain individual ("Victim-1"). HEIFLER told the UC that he had the address for Victim-1's residence (the "Victim-1 Residence"). HEIFLER then began to discuss Molotov cocktails, telling the UC, in sum and substance, that Molotov cocktails were not complicated to make, and discussed using a Molotov cocktail against an individual target. HEIFLER also told the UC that he had an escape plan, referring to a plan to leave the country at the end of April. In response to the UC telling HEIFLER that he had a car that they could use, HEIFLER stated that they would need to obtain fake license plates for the car. HEIFLER stated that he wanted to carry out the attack shortly before he left the country. HEIFLER then said, in sum and substance, "I'm thinking like if we wanted to go after [Victim-1] . . . we have [the

---

[1] Based on my experience and training, I believe that "Molotovs" referred to "Molotov cocktails," which are destructive devices constructed with bottles filled with flammable liquids such as gasoline and typically fitted with wicks, such as saturated rags, that are ignited just before the bottle is hurled.

Victim-1 Residence] address . . . So it's like that, that would be easier if you'd be more comfortable with that." HEIFLER then provided an overview of the plan: "Drive down to [location of the Victim-1 Residence], middle of April. No IDs, no phones. . . In and out." HEIFLER and the UC then made plans to meet again in a few weeks.

3. On or about March 4, 2026, HEIFLER and the UC met again in person. During that meeting, HEIFLER and the UC drove to the Victim-1 Residence to conduct surveillance using an address provided by HEIFLER.[2] HEIFLER told the UC that he had made a Molotov cocktail before, and that he had tested the Molotov cocktail for DNA using a kit that he had purchased at a pharmacy. Because the DNA testing resulted in traces of HEIFLER's DNA on the Molotov cocktail, HEIFLER told the UC that they would need gloves to carry out their plan.

4. HEIFLER and the UC then discussed their plan to build approximately 12 Molotov cocktails. HEIFLER also planned exactly where to throw the Molotov cocktails at the Victim-1 Residence, and suggested throwing several Molotov cocktails at the Victim-1 Residence and two Molotov cocktails at cars parked outside the Victim-1 Residence. HEIFLER also told the UC that he had an address where they could hide out after they threw the Molotov cocktails. HEIFLER and the UC further discussed throwing the Molotov cocktails approximately two days before HEIFLER left the country.

5. On or about March 23, 2026, HEIFLER and the UC communicated through text message on an encrypted messaging application. During the conversation, HEIFLER and the UC discussed making Molotov cocktails the week of March 23, 2026, with HEIFLER telling the UC, in sum and substance, "yeah Thursday [*i.e.*, March 26, 2026] night would be best to bake" (*i.e.*, make Molotov cocktails).

6. On or about March 24, 2026, HEIFLER and the UC communicated through text message on an encrypted messaging application. During the conversation, HEIFLER and the UC confirmed their meeting for Thursday, March 26, 2026 and ultimately agreed to meet at HEIFLER's residence in Hoboken, New Jersey. HEIFLER also told the UC that his plans to leave the country were delayed until mid-May.

---

[2] Based on my review of law enforcement records, I have confirmed that the Victim-1 Residence address that HEIFLER provided to the UC does, in fact, appear to be a home address associated with Victim-1.

- 4 -

7.  On or about March 26, 2026, HEIFLER and the UC met  at HEIFLER's residence, as planned. When the UC met with HEIFLER, HEIFLER was carrying a large bottle of Everclear, a liquor with a high alcohol content level. HEIFLER also had other components to make the Molotov cocktails present at his residence.

8.  Also on or about, March 26, 2026, at HEIFLER's residence, the UC and HEIFLER assembled eight Molotov cocktails. HEIFLER wet eight corks and one cork was placed in each of the eight Molotov cocktails. HEIFLER also put rags near the Molotov cocktails. HEIFLER explained that he would not place the rags into the Molotov cocktails until right before the attack on Victim-1's residence to ensure the efficacy of the Molotov cocktails. During the assembly of the Molotov cocktails, HEIFLER reiterated to the UC that some of the Molotov cocktails would be thrown at cars and some would be thrown directly into Victim-1's residence.

9.  After the assembly of the Molotov cocktails, law enforcement executed a federal search warrant at the residence and recovered the eight Molotov cocktails. Members of the FBI's bomb technician squad conducted a preliminary analysis of the Molotov cocktails, including a field test of the liquid inside the Molotov cocktail. The field test was positive for the presence of ethanol, a known ignition liquid for improvised incendiary devices. The preliminary analysis was that the Molotov cocktails were destructive devices.

10.  HEIFLER did not apply to, nor receive approval from, the Secretary of the Treasury to make the firearms.

- 5 -